## Illinois Central Railroad Co. v. Frances Cunningham.

1. NEGLIGENCE—*Getting Off of a Train of Cars Propelled by Steam While in Motion.*—It has been frequently held in this State that it is negligence, which precludes a recovery, for a passenger to get off of a train of which the motive power is steam, while it is still in motion.

I. C. R. R. Co. v. Cunningham.

2. APPELLATE COURT—*When It Is Its Duty to Set Aside a Verdict.*—The mere fact that a jury have passed upon questions can not absolve the Appellate Court from the duty of determining whether or not their verdict is justified by the evidence in the case.

3. VERDICTS—*When to Be Set Aside.*—Where a verdict is so clearly against the weight or preponderance of the evidence as to indicate passion or prejudice on the part of the jury, it is the duty of the Appellate Court to set it aside.

Trespass on the Case, for personal injuries. Appeal from the Circuit Court of Cook County; the Hon. JOHN GIBBONS, Judge presiding. Heard in the Branch Appellate Court at the March term, 1901. Reversed and remanded. Opinion filed May 23, 1902.

W. A. HOWETT, attorney for appellant; J. G. DRENNAN, of counsel.

JAMES C. McSHANE and THOMAS D. KNIGHT, attorneys for appellee.

MR. PRESIDING JUSTICE FREEMAN delivered the opinion of the court.

This is a suit to recover for an alleged personal injury. From a judgment rendered in favor of appellee in the Circuit Court this appeal is prosecuted.

The declaration consists of a single count, alleging, in substance, that while appellee was with due care alighting from one of defendant's passenger trains, at Randolph street station in Chicago, the defendant negligently caused the train to be suddenly and violently started, thereby throwing her upon the platform, causing serious and permanent injuries. The main questions in controversy are, first, what caused the accident; and, second, whether the injuries of which appellee complains are the result of the fall on the station platform, or of a prior trouble with which she had been afflicted. The evidence upon both these points is conflicting, and as is usual in such cases, it is urged by appellee's attorneys that the questions of fact must be deemed to have been settled by the verdict, and the finding of the jury must be sustained, unless the court can say that it is clearly and manifestly against the weight or preponderance of the evidence. The soundness of this as a general proposition need

not be questioned, but the mere fact that a jury have passed upon questions of fact can not absolve this court from the duty of determining whether or not the verdict is justified by the evidence. That duty is by the statute placed upon this court. As is said by Mr. Justice Scholfield, in C. & E. I. R. R. Co. v. O'Connor, 119 Ill. 586, on p. 595, where "there was evidence before the jury tending—how much is immaterial—to establish negligence, * * * the question of the weight of it, and of the reasonableness of the amount of damages, belongs purely to the Appellate Court." If the verdict is so clearly against the weight or preponderance of the evidence as to indicate passion or prejudice on the part of the jury, it is the duty of this court so to hold. As is said in Gehm v. The People, 87 Ill. App. 158–161, "the question whether the evidence is sufficient to support the verdict is open to determination in this court; and while we must give due weight to the superior facilities possessed by the jury for determining the truth by seeing the manner of the witnesses upon the stand, yet that consideration is not conclusive upon us that their verdict is just." See also I. C. R. R. Co. v. Kennicott, 68 Ill. App. 90. In Bradley v. Palmer, 193 Ill. 15, on page 90, it is said: "When, as in the case at bar, the record shows that the verdict is against the clear weight and preponderance of the evidence, it will be set aside, as in cases at law."

It is not disputed that appellee did meet with a fall while alighting from appellant's train, but there is direct conflict as to how it occurred. The evidence in her behalf tends to show that after the train had stopped, and when she was about to step from the car to the station platform, the train was suddenly started with a jerk, throwing her forward on her hands and knees. There is, however, important evidence introduced in behalf of appellant, which tends to show she started to leave the car before the train came to a full stop, and was thrown by stepping from the car while it was still in motion. Appellee's version is supported by the testimony of one witness, a lady who was with her at the time. Appellee, herself, states that she was wearing a

brace to support her spine, and that she could not have gotten out of her seat while the train was in motion if she had so wished. Why the motion of the train should make any difference in this respect she does not explain, and it is not made apparent by anything before us. She says: "When the train stopped I got up and walked out of the train toward the rear door, the south. Mrs. Vent was a little back of me. There wasn't any passengers in the car I was in. I saw a man on the car platform. The car was well filled when I got on. When I went to the south door I went to step off the train on the west side. When I went to step off the train it was standing. Well, I don't know what happened. I went to step off the train, and the next thing I knew I was thrown on the platform on my knees, and bounded back and struck the end of my spine. I don't know, of course, just what did happen, it was all done so quickly." She states that the car moved about ten, eleven or twelve feet, as far as she can judge. The lady who was with appellee, the only other witness in her behalf as to how the accident occurred, states that the two were sitting together in one of the middle seats of the car; that they " waited until the train stopped, and got up and went out. Miss Cunningham went out ahead of me, and I was directly behind her, within touching distance. We went out of the south end of the car. Just as Miss Cunningham was about to step off the platform the train gave a sudden lurch forward and she was thrown. I don't remember how far the train moved, but when I got off I had to walk a few steps back to her. * * * When we got to Randolph street the car was pretty well filled. As we passed out there was one person left in the car or standing on the platform." Appellee states that her left hand and right knee struck the platform and were badly bruised, and that she then fell back and struck the lower end of the spine. Just how this could occur, falling forward, as she says she did, is not made entirely clear, but the claim is that she fell, or, as she says, "bounded back" with such force as to break the coccyx, a small bone at the extreme lower end of the spinal

column. She was helped to her feet, told one of the train-men, in answer to his inquiry, that she did not think she was hurt much, and refused to give her name. She walked from the station to the Inter-Ocean building, over six blocks, and from there to a Cottage Grove avenue street car, a distance of two blocks, and two blocks further from the street car to her home.

Concisely stated, appellee's evidence is to the effect that the train had stopped at the station platform; that most of the other passengers had already left the car, and appellee was about to do so when the train suddenly started throwing her to the platform on her hands and knees. Her counsel's theory is that either the engineer pulled the train ahead suddenly or that another engine attached itself to the rear of the train and in doing so bumped into it with force sufficient to suddenly move the car the distance stated. There is, however, no specific evidence tending to show that the train was moved in either of the ways stated, and the theory is based solely on appellee's evidence above referred to, that the train, while standing still, was suddenly started ahead.

Against this testimony of appellee and her companion, appellant produces the testimony of six witnesses who state that the train in question made only the one final stop at the Randolph street station, and that it did not move thereafter until all the passengers had alighted therefrom. There is also considerable additional testimony to the effect that appellant's suburban trains made up as was the train in controversy are so coupled together that they move as a solid body and there being no slack are, ordinarily incapable of starting " with a jerk." One of the witnesses, whose business it was to disconnect the air hose and uncouple the engine at that station, says that he did so disconnect the engine immediately and that " after the engine is disconnected the air is left set on the coaches just as it was when the stop was made, leaving the cars stationary with the brakes set." It is impossible to avoid or disregard the force of this evidence. It tends to show that

I. C. R. R. Co. v. Cunningham.

the train in question did not move after coming to its final and only stop at the Randolph street platform.   Appellee's counsel recognize its force, for they practically abandon the theory that the train was pulled forward by its own engine after it had once stopped, and advance the theory that the train was suddenly moved forward by an engine coming up in the rear to remove the cars composing the train to another track, and that " the striking of this engine against the train before all the passengers had time to leave it, appears to be the true explanation as to how this accident occurred."   It is probably possible that a train could, under proper conditions, be moved forward even so great a distance as appellee's testimony states the train in question was moved—twelve to fifteen feet—by mere collision with an engine coming up to couple on behind it.   But there is absolutely no evidence that such engine came in contact with or anywhere near this train at that time; and had it done so it would have required an unusual degree of force and headway to drive the train with its air brakes set any such distance.   If we are to adopt such a theory it should certainly rest upon something more substantial than mere conjecture.

In addition, however, to the evidence of these witnesses, which certainly tends to contradict appellee's testimony that the train was moved after it had come to a full stop and before the passengers had left it, by a preponderance very nearly overwhelming in its amount and character, appellant also introduces positive evidence tending to show that appellee received her fall as a consequence of attempting to step from the train to the station platform while the train was still in motion just before it came to a full stop. These witnesses are four in number.   The first was the train conductor in charge of the train from which appellee fell.   He states that he announced the approach of the train to the Randolph street station and then stood on the rear platform of the fourth car, the train consisting of five cars; that it is the duty of trainmen to be on the platforms while trains are approaching stations; that when the train

was " almost stopped," he saw appellee " step out and fall
on her hands and knees on the platform;" that " the train
run probably fifteen feet;" that he jumped off and ran to
her, " assisted her to rise and asked her if she was hurt, and
she said no;" that he asked her name, and she declined to
give it, as did also the lady who was with her; that appel-
lee " was the first person that stepped off " the train; that
he saw also another lady accompanied by a little boy and a
dog, and procured her name and address.  He states that
it was his duty to take names of witnesses to the accident,
and that he applied to ten or fifteen people for names of
those who had witnessed the accident and they all replied
that they had not seen it or knew nothing about it, and it
was only a few minutes until all the people had gone away.
The second of the four witnesses referred to was a con-
ductor then and now in appellant's employ.  He was rid-
ing in from Parkside station as a passenger on the train in
question.  He states that as the train was approaching the
Randolph street station he noticed appellee and her com-
panion as they passed him going toward the door of the
car; that he followed them and that " the two ladies walked
out of the door and the first lady, Miss Cunningham,
stepped off before the train came to a stop and fell to the
platform;" that he started toward appellee to assist her, but
that the train conductor reached her first.  He says that
he " waited a minute and heard him ask her if she was hurt,
and she said she wasn't.  They walked down the platform
ahead of me and I walked down the platform with the
conductor, I believe, and some of the train men."  He says
that appellee was the first person off that portion of the
train, and that she " went away before the passengers had
time to gather round her."  The next witness was at the
time of the accident employed as collector on the train in
controversy, but at the time of the trial was living and in
business in Montana.  He states that he was standing on
the projecting apron of the front platform of the first car;
that when the train was within about twenty feet of com-
ing to a full stop, he glanced back and saw a lady get off

and fall, saw the train conductor get off and run toward her, and saw her getting up " just as soon as she could scramble up," and her actions did not indicate at a glance that she was badly injured. He states that his duties required him to stand out there and look back and " I always did it when we were making a stop." The last of the four direct witnesses of the accident called in behalf of appellant was the lady whose name and address was taken by the train conductor, and who was accompanied by her boy between four and five years of age with a little dog. She testifies that she was a passenger on the train, and that as the train approached Randolph street she was getting ready to get off and stood in the north doorway of the car upon which she had been riding; that she saw two ladies on the car platform facing west, one of whom stepped off while the train was still in motion, and that it ran about half a car length before coming to a full stop; that in the excitement of the moment she exclaimed, " Why didn't the lady wait until the train stopped !"

It is sought by appellee's attorneys in their brief to discredit the testimony of these witnesses, we think, without success. We discover no reason to doubt its credibility, unless it be the single fact that it gives a different version of the accident from that given by appellee and her companion. The testimony of the lady whose name was taken by the conductor is especially attacked, and it is even suggested that she is not the woman who was actually present, but some one produced by appellant to personate the woman who witnessed the occurrence. This is a most serious charge, but appears to have no substantial foundation. It is based solely on the statement by appellee, who testified in rebuttal, that she saw a woman there with a dog but not a boy, and that she did not resemble the witness in question. In this she may or may not be mistaken. But there is nothing in the testimony which discredits this witness, so far as we can perceive, and the alleged discrepancies which appellee's counsel insist upon as appearing in her testimony, if such they can be deemed, are not upon any

material point and appear to us to indicate a desire to state the facts only as she remembered them. Her testimony shows no trace of prejudice or unfairness. Nor is the version of the occurrence thus sworn to entirely inconsistent with a portion of appellee's own testimony. In a deposition formerly taken, parts of which were put in evidence, she testified: "I remember about starting to get off the train and the next thing I remember I was on the platform." In reply to the question, "Now, just tell us exactly what happened to you there," she said: "Well, I don't know what happened; I know that I got up and walked out of the train and the next thing I knew I was thrown; that is all I know about it. I didn't get off—I don't know how I got off, I mean. I don't recall anything until I was on the platform of the station. The last thing I recollect was coming out on the platform to get off the car, and I was just going to step off and the next thing I recall I was lying on the platform."

This is entirely consistent with the theory that appellee in a moment of forgetfulness or absorption failed to notice that the slowly moving train had not come to a full stop when she stepped off. At all events no sufficient reason is shown why the testimony to that effect of appellant's witnesses is not fully as trustworthy and entitled to as much confidence as that introduced in behalf of appellee. In view of all the facts and corroborative circumstances we are compelled to the conclusion that appellant has successfully contradicted the case made in behalf of appellee by an overwhelming preponderance of trustworthy evidence. There is nothing to indicate that these witnesses had any such interest in the result of the suit as to discredit their testimony. On the other hand, the interest of appellee is direct and naturally very great. She has everything to gain and nothing to lose, and though intending to be entirely truthful, her recollection and testimony might easily be affected by her supreme interest. Her companion and only witness in her behalf upon the point under consideration, frankly states that she feels a great deal of interest in

appellee and " wouldn't like to say anything on the wit-ness stand that would in any way prejudice her interests." This is natural and undoubtedly honest, even though it may not strengthen confidence in the reliability of her recollec-tion of the circumstances attending the accident.   We have examined the evidence with extreme care, and are com-pelled to the conclusion that in almost any other kind of a suit there could be no reasonable excuse for holding that appellee has made out her case against an overwhelming preponderance of evidence equally trustworthy so far as can be seen, introduced by the defense.   Strip the case of the features which are peculiar to a personal injury suit brought by a woman whose physical condition is such as to excite sympathy, against a corporation supposed to be rich and prosperous, and the evidence would not, in our judgment, be deemed sufficient by ordinarily reasonable and fair-minded men, to warrant a finding in her favor.

In view of the conclusion stated it is perhaps unnecessary to consider at length whether the evidence justifies the con-clusion that appellee's present physical condition is the result of the fall upon the station platform, except so far as the testimony on that matter may have a bearing upon the weight to be given to the verdict of the jury.   Previous to the accident in controversy appellee had been suffering from tuberculosis of the spine known as Potts' disease.   In November, 1893, she had received an injury caused by slip-ping on the sidewalk and coming down with some force in a sitting position.   In May, 1895, her physician discovered the existence of the tuberculosis, and states that this " might have been due to a tubercular germ and a slight injury together."   She was treated for this spinal trouble, and was supplied with a brace or corset designed to sup-port the head and back, and take the pressure from the softening bones of the spine.   Under this treatment appel-lee improved, but was still wearing the brace under her physician's orders, when, in July, 1896, she met with the accident at the station platform.   Two or three days after that fall, appellee sent for Doctor Allport, a physician in

the regular employ of appellant. She told him about the fall, but did not tell him about her former spinal trouble. Subsequently Doctor Owens, employed as chief surgeon by appellant, was called in consultation with Dr. Allport and examined appellee's spinal column. He states the only objective sign he discovered was a protuberance of one of the vertebræ at the base of the neck which in her case was more prominent than was natural. He states that it was such a condition as is usually found after a fracture, or in cases of Potts' disease, or of destructive inflammation of the backbone; that her condition was not consistent with a recent injury. Both Dr. Owens and Dr. Allport testify that they asked appellee whether or not she had ever suffered any previous injury, and that she told them she had not. Appellee concedes that she did not tell either of these doctors whom she had called to attend her, about her previous injury and subsequent spinal disease, but denies that either of them asked her the question. Taking her own version, it nevertheless manifests a lack of frankness, a disposition to conceal material facts. Dr. Allport's testimony is: " She told me she had never sustained any other injury and never been ailing in any way. I think I was legitimately puzzled in regard to the case, because I had either to assume symptoms such as were not compatible with my own experience or else that she did not tell the truth."

Appellee's physician, Dr. Morgan, who attended her longest and who discovered and prescribed for her original spinal trouble testifies that after wearing the brace for six or seven months she was getting better, and " was able to get about nicely." This was just before her fall upon the station platform. He states, however, that he told appellee at that time, that while she might leave the brace off within doors she ought to still wear it when out riding on cars, etc. He states that he thought she ought to wear it " a year or two longer." He went away for a vacation and did not see her for some seven weeks thereafter, during which time—in July, 1896—she met with the accident at

the railroad station. He states: "I did not expect to find her well when I returned, and when I saw her in September I suspected that her condition might be due to a recurrence of the old trouble, and was fearful of it for some time afterward. I would not have been surprised at that even without the happening of any other accident or anything of that kind. She might well have been in the same condition in which I found her in September from the condition she was in when I left in July." He testifies, however, that in his opinion her present condition is not the result of her old disease, but due to a subsequent injury, and that she has suffered a severe spinal and brain shock. Without reviewing the evidence further in detail, it must suffice to say that in our judgment there is testimony which tends to show her condition at the time of the trial may have been aggravated by a shock or concussion possibly received at the time of her fall in July, 1896; but that some of the conditions of which complaint is made may very well be the result of her original fall upon the pavement some years before, and the spinal trouble which followed.

But, as we have before stated, the preponderance of evidence sustains the contention of appellant that appellee's fall at the station platform was received in consequence of her attempting to leave the train while it was in motion. It has been frequently held in this State that it is negligence which precludes recovery, for a passenger to get off a train, of which the motive power is steam, while it is still in motion. Ill. Cent. Railroad Co. v. Lutz, 84 Ill. 598; O. & Miss. Ry. Co. v. Stratton, 78 Ill. 88; Ill. Cent. Railroad Co. v. Slatton, 54 Ill. 133; Chicago & Alton Railroad Co. v. Randolph, 53 Ill. 510; see also Ward v. C. & N. W. Ry. Co., 165 Ill. 462; England v. Boston & M. Rd. Co., 153 Mass. 490.

Objection is made that the amount of the judgment is excessive. The jury returned a verdict for $20,000. A remittitur was entered and judgment rendered for $15,000. We are of the opinion that the judgment is larger than the evidence warrants, even if it should be conceded that appel-

lant is liable at all. Appellee was earning about forty dollars a month. The verdict as originally returned is certainly unwarranted upon any theory short of vindictive damages. The theory upon which damages are allowed for personal injuries occasioned by negligence of another is compensation for the damage suffered; to make good, so far as a money award can, the wrong done by the injury.

In view, therefore, of the jury's evident disregard of the preponderating evidence, and in view of the excessive amount awarded for damages, we are forced to the conclusion that the verdict was the result of prejudice or passion or sympathy on the part of the jury, and that the case was not fairly and impartially considered; that the remittitur from $20,000 to $15,000 did not cure the vice of the verdict, and that a new trial is necessary in the interest of justice.

There are other questions presented in the briefs, which in view of the conclusion stated we need not consider at length. The judgment of the Circuit Court must be reversed and the cause remanded.