## Edmund Love v. John McElroy.

### Gen. No. 4,420.

1.  FRAUD AND DECEIT—*when action does not lie for.*  An action for fraud and deceit does not lie for the mere breach of a promise.

2.  VERDICT—*when, should be set aside.*  Notwithstanding several juries have found the same way, yet a verdict clearly and palpably against the weight of the evidence should be set aside by the court.

Action on the case for fraud and deceit.  Error to the Circuit Court of Kankakee County; the Hon. CHARLES B. GARNSEY, Judge, presiding.

Heard in this court at the October term, 1904. Reversed, with finding of facts. Opinion filed March 8, 1905.

W. J. Brock, B. L. Cooper and H. L. Richardson, for plaintiff in error.

T. F. Donovan and T. W. Shields, for defendant in error.

Mr. Presiding Justice Farmer delivered the opinion of the court.

August 3, 1898, defendant in error, McElroy, traded an engine, threshing machine and corn-sheller to plaintiff in error, Love, for a certificate the latter held for forty acres of university land in the State of Minnesota, and $400. The $400 was paid by the check and note hereafter described. There was a balance due the State of Minnesota on the land certificate of $221 which was required to be paid before the holder was entitled to a deed and this sum bore interest at the rate of five per cent. per annum. The interest had not been paid up to the date of the trade and there were also back taxes on the land unpaid. The machinery was subject to a chattel mortgage which McElroy agreed to pay and discharge. McElroy claims Love represented to him that there were no back taxes or interest against the land and that the $221 of the unpaid purchase money was all there was against it. There was in fact due for taxes and interest $68.59. This not being paid, the state subsequently sold the land for non-payment and forfeited the certificate. The land was therefore lost to McElroy and he brought an action on the case for fraud and deceit against Love to recover damages.

Love claims that when the trade was made he did not conceal or misrepresent the condition of the land, but told McElroy there were back taxes and interest unpaid, but the amount he did not know and that it was agreed between them that Love should pay these liens against the land and McElroy should pay the mortgage indebtedness against the machinery. It will thus be seen there is a radical conflict

between the parties as to the essential facts. Love further claims he subsequently paid to McElroy the money to pay the charges against the land.

This case has been tried in the Circuit Court four times. At the first trial the jury disagreed. The second trial resulted in a verdict for plaintiff which the court set aside. At the third trial plaintiff had a verdict on which the court rendered judgment. Defendant brought the case to this court by writ of error and the judgment was reversed and cause remanded. Love v. McElroy, 106 Ill. App. 294. The fourth trial resulted in a verdict and judgment for plaintiff and defendant brings the case here the second time. There is very little dispute as to the law applic<sub>..</sub>ne to the case. The main question is, was the verdict warranted, and can it be sustained by the evidence? We have read all the evidence, much of it from the record, and are of opinion the verdict and judgment are not supported by it.

The trade though talked about before, was made August 3, 1898. Love and wife assigned to McElroy the certificate for the land and the $400 was paid by a check of Sid Love, brother of Edmund, drawn on the City National Bank of Kankakee for $200 bearing date August 3, and a promissory note for $200 dated August 2, due two months after date, signed by Edmund Love and his brother Elijah, on the back of which is a written guaranty of payment by Sid Love dated August 3. These original papers are before us and it appears from the check that it was endorsed by McElroy and is stamped as paid by the bank the day it is dated.

Edmund Love and his brother Elijah, who appears to have been in partnership with him, were given possession of the engine and threshing-machine shortly after the trade was consummated. Possession of the sheller never has been given them and McElroy still retains it. After doing some threshing in Kankakee county Edmund Love went to Minnesota to see if it would pay to take the rig up there for work. Soon afterward he wrote his brothers to ship the machine there, and McElroy hearing it was about to

be shipped out of the state saw the brothers of Edmund and told them not to ship it. He claims the reason he did so was that he wanted the balance of his money, the $200 note, before the machinery was shipped to Minnesota. Edmund Love was in Minnesota and his brothers Sid and Elijah were attending to shipping the property. They testified that McElroy said he did not want the machinery sent out of the state until Edmund had paid the taxes and interest on the land as he had agreed to. Sid Love testified that McElroy told him the owner of the chattel mortgage objected to the property being shipped out of the state before the mortgage debt was paid and that if he, McElroy, had to pay it he wanted the taxes and interest paid also, and that the objection was not on account of the $200 note which was not then due. McElroy testified that Sid Love gave him a check on the National City Bank for $135 and an order on Myron Magruder, signed by Elijah Love, for $65 on a threshing account due the Loves, whereupon he withdrew his objections to the property being sent away and that this occurred the day the machinery was shipped.

Sid Love testified he wrote his brother Edmund of McElroy's objections to the shipment and that Edmund sent him statements of the taxes and interest due on the land made by the county auditor of the county in which the land was situate, which were offered in evidence and the originals certified up to us for inspection. They are dated September 2, 1898, and show the total amount to be $68.59. He further testified he showed them to McElroy and that McElroy said if he would pay him the money he would attend to the payment of the charges himself; that he, the witness, told McElroy Edmund had no money there and McElroy said if they would give him an order on Magruder for the amount he would accept it. He further testified that he wrote Edmund of this proposition and as soon as he heard from him he wrote the order to McElroy on Magruder, Elijah Love signed it, and upon delivering it to McElroy the machinery was shipped. He denies paying

McElroy $135 in money or by check at the time, and denies that the order on Magruder had any connection with the payment of the $200 note, but says it was in payment of the taxes and interest due on the land as shown by the statements of the county auditor. Sid Love further testified that when the $200, payment of which he had guaranteed, became due, McElroy came to him and told him he wanted his money; that he suggested the bank would take the note and give him the money, but when he went to the bank with the note the cashier refused to take it because it was past due, and said it was contrary to banking rules to take over-due paper but suggested that if they would make a note payable to the bank for same amount and witness and McElroy would sign it, he would pin the two together and let McElroy have the money, which they did; that McElroy received his money from the teller and that afterwards witness paid the note off and took it up together with the $200 note payable to McElroy which was pinned to it.

Elijah Love corroborates Sid Love as to the reasons given by McElroy for objecting to the machinery being shipped away, and says the first time defendant in error spoke to him about it was in August, and also as to the giving of the order on Magruder in payment of the taxes and interest on the land. The note also, given by Sid Love and McElroy to the bank, and which Sid says was for the purpose of getting McElroy's money on the note he held against the Loves, we think is corroborative of the Love version of the transaction. It was for $200, bears date October 1, 1898, and is stamped paid November 12, 1898. There is further corroboration in a letter introduced in evidence which is in the handwriting of McElroy's wife, over his name, addressed to a Mr. Peterson who was or had been treasurer of Murray county, Minnesota, the county in which the land was located. The proof shows that Mrs. McElroy attended to at least a part of her husband's writing and correspondence. The letter is dated October 24, 1898, and in part is as follows: "I would like to know what it is going to cost me to redeem that land I got of

Love and state also what the taxes and interest are.   I have
their word for it and they and you are a great deal differ-
ent.   They claim you have got the taxes too much and I
want to know before I settle with them.   Please let me
know as soon as possible and I will send the amt."   The
letter was found among the files in the office of the treas-
urer of Murray county by the then treasurer, D. J. McNam-
ara.   True, McElroy denies that he authorized the letter,
but under the proof we think it must be accepted as if it
had been written by him personally.

There was other testimony offered by the respective par-
ties, all of which we have read, but in the view we take of
the case, do not deem it necessary to quote or set it out in
substance.   If Love informed McElroy at the time the
trade was made, that there were unpaid taxes and interest
against the land, there could be no recovery in an action
for fraud and deceit, even though he had agreed to pay
them off, and failed to do so.   In order to maintain this
action, it was necessary for McElroy to prove, as alleged in
the declaration, that Love "wrongfully and injuriously
contriving and intending to deceive, defraud and injure the
plaintiff, did then and there falsely, fraudulently, deceit-
fully and knowingly represent and assert to plaintiff that
said interest had been fully paid," etc.   Gage v. Lewis, 68
Ill. 604.   To our minds the weight of the evidence shows
Love did inform McElroy that there were charges for taxes
and interest unpaid at the time the trade was made, but not
of the amount, because at that time he did not know it.
Again, the decided weight of the evidence shows that Mc-
Elroy objected to the machinery being shipped, because
Love had not paid the taxes and interest against the land,
and not because the $200 note, balance of the $400 he was
to get in addition to the land certificate, had not been paid,
and further, that the amount of these taxes and interest
charges was obtained, and the order given on Magruder,
which McElroy accepted as payment, and agreed to settle
himself with the officials in Minnesota.   Neither do we
think the account of the payment of the $200 note as given

by McElroy is in harmony with the weight of the proof. He says he and Sid Love went to the bank together, and he was there paid $135 and given an order on Magruder for $65, and that this was before the machinery was shipped. He admits signing a $200 note with Sid Love at the time, to get the money, and this note bears date October 1, while the undisputed evidence is that the machinery was shipped September 7th. The note McElroy held against Edmund and Elijah Love, and which was guaranteed by Sid, was not due until October 2nd, and he could not reasonably have demanded payment before that time. These are circumstances which to our minds show Mr. McElroy's memory of the facts and circumstances of the transaction is not clear. The letter to which we have above referred, shows also that McElroy knew the taxes and interest against the land were unpaid on the 28th of October, after the trade was made, which, according to the other proof, was several months before steps were taken by the authorities to forfeit or cancel the certificate. The final sale for taxes occurred October 28, 1899, and even then the land was subject to redemption till May 14, 1900. This would seem to indicate no very great anxiety to protect and save the land. The letter further strongly tends to corroborate the testimony offered by Love that an arrangement had been made between the parties by which McElroy was, himself, to attend to the payment of the interest and taxes to the proper authorities.

We said of this case, when it was here before: "A preponderance of the evidence is to the effect that at that time Love told McElroy there were unpaid taxes and interest and that he would pay them off; and that afterwards it was agreed he would pay McElroy the amount thereof, and that he, McElroy, was to assume the task of freeing the land from such lien, and that such payment was made in whole or in part by Love to McElroy. There is some question whether a few dollars of the amount remained unpaid. That such statement of the existence of the unpaid taxes and interest and the agreement to pay them was made, and that at least the major part of the amount was paid to Mc-

Elroy, are facts established by a preponderance of the evidence in this record. Upon such a state of facts an action for deceit cannot be maintained."

At the last trial the defense was strengthened by the introduction of the letter referred to, which was found after the previous trial, and we adhere to the views of this evidence expressed in our former opinion. The testimony of the witnesses for McElroy as to statements made by Love after the trade was made, about the taxes and interest and of his having settled them, cannot reasonably be considered as sufficient in connection with all the other testimony, to sustain this verdict and judgment. That such was the view also of the learned trial judge appears from his remarks in passing on the motion for a new trial and which he incorporated in the bill of exceptions. Among other things he said: " I am not at all satisfied with the verdict of that jury and I do not think I can hesitate in saying that the verdict of that jury was absolutely wrong, and if it was the first or second trial of the cause, I would set it aside without argument."

While great weight is and should be given to the verdict of juries and they should not be set aside by an appellate tribunal if they can be reasonably sustained, and especially when, as in this case, there have been several verdicts the same way, yet when clearly and palpably against the weight of the evidence, justice requires that they be not approved. Where the evidence is merely conflicting, even if doubtful whether the verdict is supported by the evidence as gathered from reading the record, appellate courts are inclined to sustain it because the jury having seen and heard the witnesses, were in a better position to determine the weight and credit that should be given their testimony than a court of review. But where, as here, the oral testimony in behalf of defendant below is supplemented and corroborated by documentary exhibits which we have seen and examined, no doubt is left in our minds that the verdict is manifestly contrary to the weight of the evidence. We may mention also that the corn-sheller, which according to

the evidence was of substantial value, not having been delivered to Love but being still in the possession of McElroy was apparently overlooked by the jury.

In Supreme Court of Honor v. Schwartz, 96 Ill. App. 587, this court said: "We know the rule that the jury shall be the judges of the credibility of the witnesses and what the evidence proves is of vital force in our system of trials of issues of fact. We dislike to find such issues different from the jury. An appellate tribunal having vested in it the power to review questions of fact—a power that is as much a part of the system of trial by jury as the right itself—ought not, must not, decline to express its judgment against the finding of the jury when it appears, as we think it does in this case, that the verdict is palpably against the evidence of the case." In Illinois Steel Co. v. Kinnare, 93 Ill. App. 83, it was said: "If the finding be without any support whatever, or if it be contrary to the manifest weight of the evidence, in either case the duty of this court is to so declare and to set aside a judgment based upon such a finding," citing many cases where the Supreme Court so held when it reviewed questions of fact. In I. C. R. R. Co. v. Cunningham, 102 Ill. App. 206, the court say: "But the mere fact that a jury have passed upon questions of fact cannot absolve this court from the duty of determining whether or not the verdict is justified by the evidence."

We are of opinion that justice and the best interests of the parties require an end be put to this unfortunate and expensive litigation, and the judgment of the Circuit Court is therefore reversed.

*Reversed with finding of facts.*

Finding of facts, to be incorporated in judgment of court:

We find as a fact that plaintiff in error, at the time the trade was made, informed defendant in error of the existence of back taxes and interest against the land described in the certificate and agreed to pay and discharge them, but did not at that time inform him of the amount, and that plaintiff in error is not guilty of the fraud and deceit

charged in the declaration. We further find as a fact, that subsequently and after ascertaining the amount of taxes and interest, it was agreed between the parties that plaintiff in error should pay it to defendant in error and he would attend to settling with the tax authorities in Minnesota, and that the money was paid by the order on Myron Magruder, which defendant in error accepted as payment.