John Trybula, Appellee, v. A. Plamondon Manufacturing Company, Appellant.

Gen. No. 14,913.

1. MASTER AND SERVANT—*when doctrine of assumed risk precludes recovery under particular count.* If the plaintiff confessedly knew of the defect of which he complained in a particular count, he cannot recover, nor can he recover if the evidence fails to show that the master had knowledge of such defect or that it was of such a nature

Trybula v. Plamondon Mfg. Co., 153 Ill. App. 298.

and had existed for so long a time that in the exercise of reasonable care such master should have known of it.

2. PLEADING—*when element of negligence treated as contained in declaration.* If a case has been tried by the parties upon the theory that a particular count did by some averment contain the element of negligence, such count will be so treated by the Appellate Court even though it may not have contained such element of negligence.

3. EVIDENCE—*burden of proving cause and manner of injury.* The burden of proving the cause and manner of an injury for which recovery is sought, rests upon the plaintiff; the Appellate Court will not, for the benefit of either party, indulge in speculation as to the manner in which the plaintiff's injury occurred.

4. VERDICTS—*duty of Appellate Court to review sufficiency of evidence.* Whenever the question is raised in the Appellate Court as to the sufficiency of the evidence, in point of fact, to sustain a verdict and judgment, it becomes the duty of that court carefully to analyze such evidence and to determine where the preponderance lies, even where there is a sharp conflict in the testimony of witnesses.

Action in case for personal injuries.    Appeal from the Superior Court of Cook county; the Hon. THEODORE BRENTANO, Judge, presiding.   Heard in the Branch Appellate Court at the October term, 1908. Reversed.   Opinion filed March 18, 1910.

FRANK M. COX and R. J. FELLINGHAM, for appellant.

JOHNSON, BELASCO & MCCABE, for appellee; JOEL BAKER, of counsel.

MR. PRESIDING JUSTICE CHYTRAUS delivered the opinion of the court.

A judgment against the defendant company was rendered in the Superior Court after a trial by jury. The defendant by this appeal complains of various errors in the rendition of that judgment.   The suit is by a servant against his master for a personal injury. The claim is that the injury occurred through defectiveness in a freight elevator or in its machinery.   Defendant denies the existence of any defect in the elevator or in its machinery.

The declaration contains two counts.   The first count alleges that the defendant "permitted and allowed the elevator and the machinery operating, con-

trolling and stopping the same to be and remain
loose, worn out, out of order, shaky, and otherwise
unsafe and dangerous, which facts defendant knew or
by exercise of reasonable care should have known,
but which facts plaintiff did not know, and by the exer-
cise of reasonable care could not have known,'' and that
while plaintiff, in the exercise of due care and cau-
tion for his own safety, and in the discharge of his
duties, was riding thereupon, the elevator, by reason of
the aforesaid negligence of the defendant, moved,
jerked suddenly and violently and thereby caused
plaintiff's foot to be crushed and permanently injured.
The second count alleges that the ''machinery, operat-
ing, controlling and stopping the elevator, was loose,
worn out, out of order, shaky and otherwise unsafe
and dangerous;'' that plaintiff ''then and there no-
tified the said defendant of the condition of the said
elevator aforesaid; that the said defendant then and
there promised to repair the same in a short time, to-
wit: one hour, and then and there ordered and directed
the said plaintiff to return to work upon the said ele-
vator; that the said plaintiff in obedience to the orders
and direction of the said defendant and relying upon
the promise of the said defendant returned to work;''
and that a short time thereafter, while plaintiff was
on the elevator and in the exercise of due care and
caution for his own personal safety, the elevator
''moved and jerked suddenly and violently, then and
thereby causing plaintiff's foot to be crushed'' and
plaintiff to be otherwise permanently injured.

It appears that defendant conducted a foundry
plant in which plaintiff was employed as a laborer.
The foundry was about a story and a half high. The
west part called the ''charging room'' was a very large
room and abutted upon an alley on the west. From that
room a door led into the alley. Inside the door and di-
rectly in front of it was an elevator. The elevator car-
ried material up to a platform, for a cupola which was
located within a few feet of the door. The elevator

ran a distance of only from eleven to fifteen feet high. It moved very slowly. According to Zachwiega, plaintiff's principal witness, it took the elevator about five or six minutes to travel to the top. The elevator had wire caging, on the north and south sides but was open at the east and west ends. The platform of the elevator was four feet six inches wide, north and south. The door into the alley was somewhat wider. That door had a doorsill, on a level with the alley, which doorsill was three inches in thickness and projected about nine inches into the "charging room." The testimony of different witnesses varies as to the width of the space between the doorsill and the elevator platform when the platform was on a level with the doorsill. Plaintiff fixed the space at about half an inch. Zachwiega said its width was about two inches— at the most three inches. Another of defendant's witnesses said its width was about an inch or more. The space directly below the projecting doorsill down to the ground, that is, below the nine inches of the doorsill's width, was open back to the wall. The distance between the ground and the doorsill was about three feet.

At the time plaintiff was hurt, January 10, 1907, at about two o'clock in the afternoon, he, Zachwiega and a third man were engaged in bringing scrap iron, pig iron and similar material up to the cupola platform by means of a truck and the elevator. As stated, the elevator platform was four feet six inches wide and six feet six inches in length. The truck or, as sometimes called, the buggy had four wheels which were sixteen inches in diameter and had rims about two inches in width. The truck had a table or platform which stood up twenty inches high from the floor or ground. That table was three feet six inches in length and twenty-four inches in width. The wheels were outside of the table and between the extreme outsides of the wheels the truck was twenty-nine inches in width. At what may, for convenience, be called its front end, the truck had a pole or long handle, so ar-

ranged that it could be made to stand upright. At the rear end of the truck the location of the wheels was such that the back part of the rear wheels was about six inches forward of the rear edge of the truck's table, that is, the rear edge of the table projected about six inches back of the back part of the wheels. Plaintiff's witness Zachwiega testified, both upon his cross and his direct examination, that the dimensions of the truck were two feet in length and one and a half feet in width; but in his measurements this witness is utterly unreliable. He fixes the distance from the doorsill or level of the alley down to the foundry floor at about a foot and a half, less than any other witness by one half. When plaintiff was injured, he and the other two men were upon the elevator with the truck, loaded by them with scrap iron or pig iron, which they were taking up to the cupola platform. Zachwiega testified that the loaded truck weighed about a ton and plaintiff estimated the weight at three or four hundred pounds. Clybourn, cupola tender, who testified on behalf of the defendant, fixed the weight at about eight or nine hundred pounds. The elevator platform was a wooden one "not real smooth but it was in good condition," and, according to plaintiff. there was a little iron dust and sand on it. Zachwiega testified that they placed the truck "right in the middle" of the elevator platform. The truck was brought upon the elevator from the east and stood lengthwise east and west with the rear end toward the alley. No iron stuck over the edges of the truck table and none fell off. As the elevator platform was six feet six inches long and four feet six inches wide and the truck table was three feet six inches long and twenty-four inches wide, with the wheels projecting on the sides, the larger space for the men to stand upon in going up on the elevator was at the ends. Assuming the truck to stand precisely in the middle of the elevator platform, we have a foot and a half of the elevator platform west of the truck table. The witnesses who testify on the subject all agree that Zachwiega, plaint-

iff, and the third man all placed themselves west of the truck in going up with the elevator. Zachwiega, who conducted the elevator, placed himself at the southwest corner of the elevator platform, where the ropes controlling it were. The theory of the plaintiff's case, according to the evidence, is that when the platform was from six inches to a foot below the doorsill the elevator suddenly "jerked" straight up and down so that it set the truck in motion backward and the rear wheel of the truck to the north, "struck," "pushed" or "shoved" his left foot and "twisted" it under the doorsill. The outer part of his left foot, including the second toe, was somewhat injured. The second metatarsal bone was the only bone fractured and that has since united so as to be as strong as ever, but there is some limitation of motion.

Plaintiff was about twenty-nine years of age. He had been employed at the foundry about five months when he was hurt, and, while employed there, he had used the elevator, as he says, several times a day.

Zachwiega testified that plaintiff and he were accustomed to load up the truck, push it on the elevator and take it up; that he, Zachwiega, generally started the elevator; that for about three or four days before plaintiff was hurt he noticed the elevator jerked, sometimes twice and sometimes three times a day; that before plaintiff was injured, on the day he was injured, he had made about six trips on the elevator with plaintiff, and during those "it jumped about three times;" that the three men were on the elevator when plaintiff was hurt; that he, Zachwiega, stood on the elevator platform west of the truck at the southwest corner; that plaintiff, also, stood at the west end of the truck but at the other corner—the northwest corner; that when the truck was on the elevator platform Trybula, the plaintiff, was obliged to stand where he stood because there was no room for him to stand on either side of it; that whenTrybula stood on the elevator, before it started, the doorsill was right up against his leg; that when the elevator started up Try-

bula stood with his back toward the doorsill and facing east; that the table of the truck was half a foot above the elevator platform; and that when the elevator platform came up to about the doorsill the elevator jerked and the truck was moved backward, struck Trybula's foot and pushed it under the doorsill. Zachwiega testified that he then, by mistake, first pulled the wrong cable and caused the elevator to go up instead of down, when Trybula cried out.

Trybula, the plaintiff, testified that when the elevator started up, there was just sufficient space between the west end of the truck and the edge of the elevator platform for a man to stand there, and that he stood between the west end of the truck and the platform's edge, facing east; that he then carefully looked down and saw his left foot was two and a half inches back from the edge of the platform; that when he was hurt the wheel was east of his left foot and "the right foot was between both wheels;" that the elevator had been jerking for three or four days, but not as much as on the day of the accident; that he did not notice how far up from the bottom the elevator was when it jerked, but it went up a little and then jerked; that it "jerked straight up and down and sudden;" that he could not tell how far, up and down, it jerked; that it was the wheel of the truck which struck his left foot and twisted it and pushed it "into the hole;" that his foot was caught "right under the ledge;" that the wheel struck the inside of the foot opposite the instep; and that that part of his foot caught was the left side of his left foot extending almost half way across and from the toes back to the instep. Plaintiff also testified that on the morning of the accident the elevator jerked a little more than before; that it was jerking more at eleven o'clock in the forenoon than when he went to work in the morning; that it jerked more in the afternoon than it did in the forenoon; and that on the day he was injured, between ten and eleven o'clock he talked to the boss, Pete, about the trouble. The conversation with the boss, Peter Berg, as testified

to by plaintiff, the record discloses to have been as follows:

"Q.  What did you say to him and what did he say?
A.  Mr. boss, elevator is no good.

All right, Joe.  Me see.  Me pull rope.  Me pull down.  Me all right.  Me fix after while.

Mr. Cox:  Me fix after while.

The interpreter:  That is the best I can do.

Mr. Johnson:  Q.  What, if anything, did he do with reference to examining the elevator?

A.  Well, he went to examine that elevator, but there was nothing on it and the elevator wasn't jerking very much that time.

Q.  What did he say after he had examined it?

A.  He said all right, that he will order to fix it  *  *  *.

Mr. Johnson:  Q.  State what, if you know, he said with reference to time.

A.  Well, as I said before, the foreman said to me that he was going to order people to fix that elevator and then (speaking English):  Me fix after awhile  *  *  *.

Q.  And what, if anything, did he say to you with reference to continuing your work?

Mr. Cox:  I object to the form of the question.

The Court:  Yes, sustained.

Mr. Johnson:  Q.  Did he say anything further?

A.  He ordered me to work and told me after a while he would fix it."

This testimony of the plaintiff, on the subject of information to the master of a defect, was all the evidence on the subject on plaintiff's behalf.  Peter Berg, the foundry foreman, testified, on behalf of defendant, that Trybula never spoke to him about the elevator nor did he ever speak to Trybula about the elevator.  The foregoing is all the evidence in the record relating to the subject of such information.

Another witness, Cichy, on behalf of plaintiff, testified that he stood on the floor, about five feet from the elevator, when plaintiff was hurt; that he saw the elevator "moved up and jerked and the truck moved on

the side,'' but he did not see what caused plaintiff's injury; that plaintiff stood on the west side of the platform, a little bit sideways, looking forward the east; that the left side was the closer toward the alley but his back was ''mostly'' toward the alley; that the elevator jerked ''twice, once up and down;'' that he looked at it close enough to see how far it dropped when it jerked and it jerked down first, a quarter of an inch; that when it jerked down the quarter of an inch it ''jerked down and shook;'' that ''when there was a jerk it shook all''—''When the elevator jerked it down, it tipped and went to the other side, too''—''It shook towards all sides;'' that he saw the truck move and it moved ''maybe an inch, maybe two'' backwards.

Defendant adduced evidence to prove that there was no defect in the elevator or its machinery and that it did not ''jerk.'' Johnson, a millwright in defendant's employ for seventeen years, testified that when testifying he was not in the employ of defendant, but he was in its employ when plaintiff was injured; that he was employed in defendant's foundry about five years and when any repairs were to be made there he was the one who made them; that at the time plaintiff was injured he was called and came to the elevator a couple of minutes after plaintiff was hurt; that he then ran the elevator up and down four or five times and there was nothing out of the ordinary in the operation of it; that there was no jerking; and that there was then nothing out of order or broken about the elevator.

Rumley, city elevator inspector, testified that he examined this elevator in the fall of 1906 and that the elevator and its machinery was then in good condition and that he examined it again in February, 1907, and tested its operation and it was then in good condition.

Peter Berg, foundry foreman, testified that during the afternoon after plaintiff was injured he saw the elevator go up thirteen times with a wheelbarrow of

coke for the cupola each time and there was then no jerking; and that he never saw the elevator jerk.

Clybourn, the cupola tender in the foundry, testified that he was standing there about four feet from the elevator and when the elevator was about three feet from the foundry floor Trybula cried out; that the elevator traveled all right at that time and right after and that he noticed no jerking or anything wrong with the elevator; that they continued to carry up iron with the elevator after Trybula was hurt; that during the afternoon he saw the two men who were with Trybula go up five or six times and in the course of his work he himself went up three or four times; that the elevator did not jerk that afternoon, nor was there anything wrong with it and he was right there and saw the elevator used with loads on it; that there were no repairs made that afternoon; that on the morning of the accident at about ten o'clock he took up a load of sand of about half a ton on the elevator and then he noticed nothing wrong with it; that for a month before the accident he used the elevator ten or fifteen times a day and he observed no jerking of the elevator; that he used the elevator every day for four or five months after the accident and observed nothing wrong with it and no jerking, and that there were no repairs upon the elevator until five or six months after the accident.

Kline, an employe of defendant, testified that before the accident he took up heavy wheelbarrows of sand for the cupola, coke and pig iron, every day and never observed the elevator jerk, but it went up all right; and that after the accident he took up sand every day and the elevator did not jerk.

Morabec, an employe of defendant, testified that on the day of the accident, before plaintiff was injured, he took up coke, sand and wood, on the elevator, and he did not see it jerk; that in the afternoon after the accident he took up two wheelbarrows of coke and scrap iron and he did not see it jump or jerk then; that for about two months before the accident he took

up thirteen wheelbarrows of coke each day and during that period he at no time saw the elevator jerk when going up with a load, and that for about a week after the accident he hauled up stuff steadily and saw no jerking of the elevator on any day.

Aside from the testimony as to the elevator "jerking," there is no claim that there is any evidence tending to show any defect in the elevator or its machinery, such as complained of in the first count of the plaintiff's declaration. This jerking, if it jerked, was well known to plaintiff. According to plaintiff and Zachwiega the elevator had jerked "sometimes twice and sometimes three times a day" for only about three or four days before plaintiff was injured. There is no other evidence tending to show that the elevator jerked; nor is there any evidence tending to show from what defect it jerked if it did jerk. It may have jerked because of some act by the operator who controlled it. At all events, when all the facts and circumstances are considered, it is perfectly clear that upon the evidence in this record there can be no recovery upon the first count; not only for the reason, as will be shown later, that there can be no recovery at all, but, also, because plaintiff himself, confessedly, knew of the defect of which he complained in this count and because the evidence fails to show that defendant either had knowledge thereof or that it was of such nature and had existed for so long a time that, in the exercise of reasonable care, defendant should have known of it.

The second count fails to state any cause of action. This count omits negligence as a cause or as an element in the cause of action. It does not predicate a right of recovery upon negligence at all, but upon the facts; that the relation of master and servant existed, that an appliance in use by the servant was unsafe and dangerous, that the servant informed the master of the condition of the appliance, that the master promised to repair the same and, at the same time, ordered and directed the servant to make use of the

appliance which he accordingly did, and that within a short time thereafter, to-wit, one hour, the servant, plaintiff, was injured by reason of the defective condition of the appliance. However, the case was tried by the parties upon the theory that this count did by some averment contain the element of negligence and it will, therefore, be so treated by us.

From the evidence it appears that when he was injured plaintiff stood upon the elevator platform west of the loaded truck and at its northwest corner. The space upon the elevator platform between the edge of the truck's table and the edge of the elevator platform was eighteen inches in width. There was also a space of an inch or two between the elevator platform and the doorsill in connection with which plaintiff's foot was injured. While facing mainly east, toward the truck table, he stood "a little bit sideways" with his left side slightly toward the alley; so that, speaking with greater precision, he faced slightly northeast. Plaintiff's left foot was upon the elevator platform west of the north rear wheel and two and a half inches from the platform's edge. This placed his left foot well away from the north rear wheel of the truck, for the rear edge of the truck's table projected back of the wheel's rim about six inches. From the starting of the elevator until plaintiff was hurt, Cichy stood watching them. He is the only witness who undertakes to tell us with any degree of particularity how the elevator jerked and how much it jerked. He, also, informs us that he saw the truck move backwards when the elevator jerked up and down and that the distance it moved backward was "maybe an inch, maybe two." His testimony is the only evidence in the record as to how far the truck moved. The only definite evidence in the record as to the manner in which plaintiff's foot was injured is his own testimony that the north rear wheel of the truck struck the inside of his foot opposite the instep and twisted and pushed his foot in under the doorsill. That plaintiff's foot was injured in that man-

ner appears physically impossible when the evidence in this record is all considered together. The probability is, whether the elevator did or did not jerk, that plaintiff, in a moment of carelessness, projected his foot, which he says he placed two and a half inches from the platform's edge, over that edge. Even though we give the plaintiff the benefit of disregarding Cichy's particularity and exactness, with reference to the jerk of the elevator being a quarter of an inch and the movement of the truck being but an inch or two backward, plaintiff's situation is no better. It still appears to us impossible that plaintiff was injured in the manner and under the circumstances, as he claims. The existing conditions at the moment he was injured, concerning which there is no conflict in the evidence, discredit plaintiff's evidence as to the manner in which, and the circumstances under which he was injured. The burden of proving the cause and the manner of his injury rested upon the plaintiff. We may not for the benefit of either party indulge in speculation as to the manner in which plaintiff's injury occurred. Three men stood west of the truck upon the elevator platform. It is uncontroverted that they all stood *between* the edge of the truck's table and the doorsill. There is no question but that the edge of the truck's table projected back of the truck's wheels about six inches; nor is there any question but that the plaintiff's right foot was between the truck's rear wheels, upon the elevator platform. If the truck suddenly moved backward to the extent that the north rear wheel of the truck could have "twisted and pushed" plaintiff's left foot under the doorsill, as plaintiff testified, the edge of the truck's table, twenty inches above the floor, necessarily moved backward simultaneously with the wheel and with like suddenness and if so, projecting as it did, would have struck plaintiff's right leg (had his left been so far north as to escape the table) and the legs of the other persons west of the truck's table *before* the wheel could have come in contact with plaintiff's left foot. The table's

edge coming in contact with plaintiff's right leg would, necessarily, have forced the leg against the doorsill and injured it, before such injury as he describes would have happened to the left foot. There is no evidence that the table's edge occasioned any injury to the plaintiff's right leg or to any one other that the plaintiff. This is decisively inconsistent with plaintiff's positon and theory in the case.

Furthermore, plaintiff advances the contentions that defectiveness in the elevator or its machinery caused the elevator to jerk in the manner claimed by plaintiff and that the master promised to repair such defectiveness. In respect of both these contentions the burden of proof was upon the plaintiff to establish the contentions by a preponderance of the evidence. While there is evidence that the elevator jerked there is none that the jerking was caused or occasioned by the "elevator and the machinery operating, controlling and stopping the same," being "loose, worn out, out of order, shaky, and otherwise unsafe and dangerous," as alleged, or that the defendant was negligent in permitting it to be in such condition. It is well possible that plaintiff's fellow servant, Zachwiega, may have caused the elevator to jerk. We have carefully analyzed the evidence and, considering not only what the witnesses have said but also the inherent nature and character of their testimony, we are convinced, also, that plaintiff has failed to establish, by a preponderance of the evidence, both the contention that the elevator jerked and the contention that the master was informed of some defect in the elevator or its machinery and promised to repair the same. This failure would alone require us to reverse the judgment rendered. Whatever we may think of the policy of the rule, the law invests this court with the power and requires of us that we perform the duty to review the verdict of the jury upon questions of fact. Indeed, this is the court of last resort in respect to questions of fact. Whenever the question is raised in this court as to the sufficiency of the evidence, in point

of fact, to sustain the verdict and judgment, it becomes our duty to carefully analyze the evidence and determine where the preponderance lies, even where there is a square conflict in the testimony of witnesses. Should we fail in that respect we should be derelict in our duty. Under the law we have no right to shift that burden, upon the trial court or the jury. True, this court should be slow in disturbing the verdict of the jury and the judgment of the trial court and should not do so except upon firm conviction that injustice would otherwise be done and after a careful consideration of all the evidence.

In Donelson v. East St. L. Ry. Co., 235 Ill. 625, our Supreme Court held that the constitution does not make the jury the final judges of the weight of the evidence. To the same effect are C. & R. I. R. R. Co. v. McKean, 40 Ill. 218; Borg v. C., R. I. & P. Ry. Co., 162 Ill. 348; and City of Spring Valley v. Coal Co., 173 Ill. 497. In the Donelson case the court also said: "If a verdict is manifestly against the weight of the evidence, it is not necessary that it should further appear that it is not the result of the impartial and honest judgment of the jury, nor that it resulted from prejudice, passion or some improper motive or condition. To permit a verdict, which is clearly and manifestly against the weight of the evidence, to stand, upon the supposition that the jury were impartial and honest, would be as unjust and injurious to the defeated party as though it proceeded from passion, prejudice or some improper motive." This court said in I. C. R. R. Co. v. Cunningham, 102 Ill. App. 206: "The mere fact that a jury have passed upon the questions of fact cannot absolve this court from the duty of determining whether or not the verdict is justified by the evidence. That duty is by the statute placed upon this court." In Hebard v. Tilley, 134 Ill. App. 1, this rule was reiterated. See also Wentz v. Wilson, 52 Ill. 440.

The language used in C. & A. R. R. Co. v. Shannon, 43 Ill. 338, and Miller v. Balthasser, 78 Ill. 302, to the

effect that a verdict will not be set aside where the evidence is conflicting unless it is apparent that the jury was actuated by passion, prejudice or a palpable misapprehension of the facts is squarely overruled by what is said in Donelson v. East St. L. Ry. Co. above quoted. Were it in a particular case, where the defendant attacked the judgment of a trial court on the ground that the evidence was insufficient to sustain the verdict, demonstrable that the evidence was evenly balanced it would be our duty, under the law, to reverse such judgment because the plaintiff had failed to prove his case by a preponderance of the evidence. Here plaintiff failed to prove, in the manner the law required him to prove, that the master was informed of an existing defect and that he promised to repair. No reason is shown for believing Trybula as against Berg, while reasons to the contrary appear.

There are also some errors in the rulings upon evidence and in the instructions, which we regard as prejudicial to the defendant, but in view of our disposition of the case it is unnecessary to specifically refer to them.

The judgment of the trial court will be reversed and the cause will not be remanded.

*Reversed.*